<u>**NOT FOR PUBLICATION**</u>

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| VIRIDIAN RESOURCES, LLC, <br><br>               *Plaintiff*, <br><br>   v. <br><br> INCO LIMITED, n/k/a VALE CANADA LIMITED, <br><br>               *Defendant.* | Civil No.: 2:18-cv-15021 (KSH) (CLW) <br><br><br><br> <u>**OPINION**</u> |

<u>**Katharine S. Hayden, U.S.D.J.**</u>

**I.  Introduction**

Plaintiff Viridian Resources LLC's ("Viridian") owns "phytomining" technology, a process that uses plants to extract metals from soil.  Beginning in 1995, Viridian and defendant Inco Limited, n/k/a Vale Canada Limited ("Vale"), which owns mining rights overseas, explored ways by which Vale's mining operations could incorporate Viridian's technology.  Over the next several years, the parties executed written agreements outlining the specific terms and conditions of their relationship.  The agreements called for a period of feasibility studies, after which the parties could pursue a phytomining joint venture.  If negotiations over the joint venture proved futile, Viridian could elect to phytomine unilaterally on Vale's land subject to certain conditions.

The parties completed feasibility studies and opted to negotiate the terms of a potential joint venture.  When Vale broke off those negotiations several years later, Viridian notified Vale of its election to proceed with phytomining operations without Vale's involvement.  Vale took the position that Viridian's right to phytomine unilaterally had long since expired and refused to honor its election.

The instant lawsuit followed.  Viridian filed a one-count complaint in Bergen County Superior Court arising from Vale's alleged breach of the parties' agreements.  After Vale removed the action to this Court on diversity grounds, Viridian filed the operative amended complaint asserting contract, quasi-contract, and tort claims.  Presently before the Court is Vale's motion to dismiss the amended complaint with prejudice.  (D.E. 127.)  The motion is fully briefed, and the Court decides it without oral argument pursuant to Fed. R. Civ. P. 78(b) and L. Civ. R. 78.1.

## II.    Factual Background

The amended complaint alleges as follows.  Viridian is a Texas company that has developed patented and proprietary "phytomining" technology.  (D.E. 11, Am. Compl. ¶ 11.) Executed like a large-scale farming operation, phytomining is "a next generation mining and soil remediation technology" that uses "specialized plant species to hyperaccumulate and extract from the soil various metals, including nickel, cobalt and the platinum group metals."  (*Id.* ¶ 3.)  These metal-tolerant hyperaccumulator plants can survive in soils with elevated metal levels typically regarded as "difficult or impossible growing environments," making phytomining technology "particularly suitable for use in revegetation projects in areas impacted by previous mining activity."  (*Id.*)

In 1995, Vale (then Inco Limited) began working with Viridian (then NKT Phytomining Company) to introduce Viridian's phytomining, phytoremediation, and revegetation technology into Vale's "various mining and smelting operations."  (*Id.* ¶ 13.)  The parties executed a series of written contracts, including the Phytomining Technology Agreement on July 15, 1997 (the "PTA") and the Phytomining Rights Agreement on December 22, 2003 (the "Agreement"), under which Viridian "agreed to perform certain phytomining, phytoremediation, and revegetation services for

Vale" and to reveal the related proprietary technology.  (*Id.*)  Both contracts contained non-use and non-competition clauses that protected Viridian.  (*Id.*)

The Agreement also "granted Viridian a number of benefits and rights including access and phytomining rights to areas controlled by Vale."  (*Id.* ¶ 14.)  The Agreement reflects the parties' intention "to work together to allow Viridian to develop phytomining operations on Vale's lands," which contain "phytominable deposits believed to exceed $10 billion in contained metal value" in the current market.  (*Id.* ¶ 15.)  These rights were granted to Viridian upon its signing the contract; however, Article II of the Agreement additionally contemplated collaboration between the parties on the initial phytomining efforts ("Phase I Collaboration") and established a post-Phase I Collaboration timeline to govern the parties' subsequent dealings, including each party's election as to whether or not it wanted to enter into a joint venture ("V-I Joint Venture").  (*Id.* ¶¶ 16, 18; *see* D.E. 11-1, Agreement Art. II.)  In turn, Article III provided for Viridian to pursue phytomining operations on its own should joint venture negotiations prove futile.  (Am. Compl. ¶ 18; Agreement Art. III.)  The amended complaint sets forth the timeline as follows:

a) Viridian is granted extensive phytomining rights and privileges as of the effective date of the Phytomining Rights Agreement.

b) Viridian and Vale work up a plan for, and conduct, a Phase I Collaboration, and the parties each provide their data from the Phase I Collaboration to the other party;

c) Within 30 days of provision of the data, Viridian and Vale hold a Phase I Meeting;

d) Within 30 days of the Phase I Meeting, Viridian and Vale tell the other if they want to form the V-I Joint Venture;

e) If both Viridian and Vale wish to form the V-I Joint Venture, they negotiate in good faith toward the V-I JV Agreement;

    f)    If after 90 days no V-I JV Agreement is formed, Viridian can elect to move forward with a phytomining Operation without Vale's involvement, triggering a subsequent 180-day period to try to reach the V-I JV Agreement;

    g)    If after the subsequent 180-day period no V-I JV Agreement is reached, Viridian can move forward with the phytomining Operation by establishing phytomining operations in the areas where it was granted phytomining rights, and Vale has to cooperate with Viridian in that regard.

(Am. Compl. ¶ 22.)

Viridian asserts that "[t]here is no dispute that Viridian and Vale went through the Phase I Collaboration, which took several years, at the end of which the parties agreed to move forward with negotiation of the V-I JV Agreement." (*Id.* ¶ 23.) A copy of Vale's written October 12, 2007 initial election to proceed with the joint venture is appended to the amended complaint. (*Id.*, Ex. B.)

Viridian alleges that in the four-year period that followed this election, the parties "actively negotiated the terms of their joint venture," "engag[ing] in numerous telephonic and in-person meetings, as well as electronic exchanges of draft term sheets and draft agreements concerning the joint venture." (*Id.* ¶¶ 24-25.) Additionally, Viridian "sought out and obtained financing proposals for the proposed [j]oint [v]enture," noting a November 8, 2007 term sheet from Deutsche Bank for an unsecured $65 million loan to cover 100% of the venture's costs. (*Id.* ¶ 26.)

On March 31, 2011, Vale expressed interest in purchasing Viridian and proposed an equity acquisition as an alternative to the joint venture structure being discussed. (*Id.* ¶ 27.) Thereafter, the parties pursued the equity option and joint venture negotiations simultaneously. (*See id.* ¶¶ 28-36, 39-43.) In fact, the agenda for the parties' July 6, 2011 meeting at Vale's Toronto office reflects both a "term sheet discussion" and an "equity discussion." (*Id.* ¶ 31, Ex. D.)

With respect to the joint venture negotiations, in April 2011, Vale sent Viridian a detailed draft term sheet. Viridian responded with a markup of the document. (*Id.* ¶ 29.) Viridian asserts

4

that its May 16, 2011 markup "reflect[ed] Viridian's understanding of what was under discussion, and that Viridian had every intention of moving forward with or without Vale." (*Id.*)  In relevant part, it provides:

> WHEREAS on December 22, 2003, Viridian Resources, L.L.C. ("Viridian") and Inco, Ltd ("Inco"), the predecessor in interest to Vale Canada Limited ("Vale"), entered into a Joint Venture Agreement ("2003 JVA"), which is in full force and effect, and
>
> WHEREAS, in accordance with Article II of the 2003 JVA, Viridian and Vale wish to enter into a definitive joint venture agreement in respect of Preliminary Groundwork and Phytomining Operations on certain designated properties ("2011 JV Agreement").
>
> NOW THEREFORE, it is hereby agreed as follows:
>
> 1. Viridian and Vale hereby reconfirm the existence, force, and effect of the 2003 JVA.
>
> ….
>
> 4. The 2003 JVA shall remain in full force and effect unless and until the 2011 JV Agreement is executed by all parties.

(*Id.*, Ex. C.)  Viridian alleges that "Vale included similar language concerning the [Agreement] remaining in full force and effect in its subsequent versions of the term sheet including its last one." (*Id.* ¶ 30.)

Vale provided a revised term sheet on January 17, 2012.  Days later, on January 21, 2012, it sent a follow-up email signaling that "positions ha[d] changed" since the last draft was exchanged.  (*Id.* ¶¶ 39-40, Ex. H.)  Vale sent Viridian an updated draft of the term sheet on January 23, 2012, and after email and phone discussions over the next several months, provided another draft on May 30, 2012.  (*Id.* ¶¶ 40-41.)  Accompanying the draft was the following message, which Viridian alleges "reiterat[ed] [Vale's] views that negotiations were ongoing in earnest":

> Thanks again for your continued patience.  As discussed, attached is the revised Term Sheet.  Note that this draft reflects changes to the last draft circulated between

> the parties, being Viridian's January 30th draft. Edits reflect our tentative agreement on terms discussed over the course of the last few months and most recently our mutual understanding of the $2.5M fronting amount and break fee payable on unilateral termination. In your review of the draft please keep in mind that the term sheet is a preliminary document – more specific language can be discussed and agreed when we draft the definitive agreement.

(*Id.* ¶ 41, Ex. I.)

Viridian responded on July 11, 2012, with a revised draft that "adopted the bulk of Vale's proposed changes," to which Vale responded: "We are in receipt of and thank you for your counterproposal of July 11th. We expect to be in contact with you toward the end of next week." (*Id.* ¶¶ 43-44, Exs. J, K.) Then on July 31, 2012, Vale sent a letter to Viridian "purporting to break off the negotiations and electing not to proceed with the V-I Joint Venture, specifically referencing Viridian's July 11, 2012 'counter-proposal'" as "unacceptable." (*Id.* ¶ 45, Ex. L.)

Viridian alleges that this July 31, 2012 communication marked the first definitive notice of Vale's election not to enter into the joint venture, thus opening the door for Viridian to proceed with a phytomining operation of its own and triggering the 180-day period of further negotiations, as provided by Article II, Section D of the Agreement. (*Id.* ¶ 46.) As will become apparent, Vale contends that the door had opened years before in January 2008—90 days after the parties' October 2007 election to pursue a joint venture—and that contractually Viridian was well out of time to proceed on its own.

Viridian alleges that its interest in moving forward with phytomining operations had "never dimmed" throughout the parties' various negotiations, but that Vale withheld "critical information" including detailed maps of potential phytomining sites, information related to the characteristics of those sites, and external factors that might impact the success or feasibility of

future phytomining operations on those sites.[1]  (*Id.* ¶¶ 47, 49.)  Viridian further alleges that this information was "held exclusively by Vale" and that when Viridian "repeatedly asked for such information," Vale assured Viridian that it would provide the information when needed, as either "part of the joint venture's preliminary activities" or "if the joint venture negotiations were unsuccessful." (*Id.* ¶ 48.)

Viridian alleges that from the time of Vale's July 31, 2012 letter through early 2014, "Vale made it very difficult for Viridian to move forward" by "brush[ing] off or simply ignor[ing]" Viridian's repeated requests for necessary information. (*Id.* ¶ 50.)  Discussions between the parties resumed on February 4, 2014, and in an email dated February 5, 2014, Vale requested that Viridian send along "details on [its] current thinking" about proceeding solo, as well as points of discussion for an anticipated conference call with the Vale team.  (*Id.* ¶ 51, Ex. M.)  Viridian responded on February 18, 2014, informing Vale of its election to move forward either with the V-I Joint Venture under Article II of the Agreement, or to pursue its own phytomining operation under Article III, and sent a follow-up email to this effect on March 17, 2014.  (*Id.* ¶¶ 52-53, Exs. N, O.)

On April 10, 2014, Vale sent the following email:

We've discussed with management your intention to proceed to phytomine independently, and with respect to such right as Viridian might have had under the terms of the 2003 Agreement to proceed unilaterally, **our view is that Viridian has not sought to exercise its right within the time permitted by the Agreement and/or within a reasonable time**. **To the extent your email of February 18, 2014 indicates Viridian's interest in exercising an alleged right to proceed independently with Viridian operations, it is untimely, as the time period for the exercise of any such right has long since expired.** Accordingly, Viridian has no right at this time to proceed with Viridian operations.

---

[1] According to Viridian, Vale was required to turn over such information under Article XIV of the Agreement, which sets forth Vale's obligation "to make available to Viridian any and all information reasonably required by Viridian to evaluate potential Phytomining opportunities with the Initial Target Sites, including, but not limited to, surveys, analysis, reports, maps, databases and feasibility studies."  (*Id.* ¶ 67; *see* Agreement Art. XIV.)

(*Id.* ¶ 55, Ex. P (emphasis added).)  Two minutes later, Vale sent Viridian a second email:

> As you know, Vale's position is that the time period for Viridian to exercise such rights as it might have had under the 2003 Agreement to proceed on its own with Viridian operations expired long ago, such that Viridian has no right at this time to proceed with Viridian operations.  Nothing in this correspondence or in any future communication with Viridian is intended by Vale as a waiver of its position as stated above and in its earlier email of today.
>
> **Vale's position is that the time period for Viridian to exercise such rights as it might have had under the 2003 Agreement to proceed on its own with Viridian operations expired long ago, such that Viridian has no right at this time to proceed with Viridian operations . . . .  To the extent the parties may have elected to enter into a joint venture, that occurred in 2007/2008.  No joint venture agreement was ever consummated between the parties.  Accordingly, any right that Viridian might have had to proceed on its own with Viridian operations would have arisen in 2008 at the latest.** Viridian delayed for a period of over 5 years before indicating an interest in proceeding on its own with respect to Viridian operations. Any such right to do so under the 2003 Agreement had long since expired.
>
> Bearing in mind the contents of your referenced email, Vale suggests a meeting to discuss where the parties stand.

(*Id.* ¶ 56, Ex. Q (emphasis added).)  The parties met two months later on June 18, 2014, in Canada with the aim to resolve "any disputes"; however, Viridian asserts that Vale "never provided Viridian with what it needed to move forward with its own phytomining operation and continued to den[y] Viridian access to the areas that Viridian had the right to phytomine."  (*Id.* ¶¶ 60, 63.)

Viridian additionally alleges in the amended complaint that Vale breached Article XV of the Agreement "by engaging in certain competitive activities expressly prohibited by [the Agreement's non-compete provision]," resulting in significant economic harm to Viridian.  (*Id.* ¶ 69.)  Article XV reads:

> During the term of this Agreement and in the event that Inco terminates this Agreement for any reason other than a default by Viridian pursuant to Article VIII, for five years after any such termination (the "Relevant Period"), **Inco shall not at any time develop or secure any rights with respect to, or participate in any business opportunities in, Phytomining, which, in each case, are directly competitive with Viridian's Technology based upon the patent(s), license(s),**

**trade secrets, or any other recognized rights, Viridian holds with respect to the use of Viridian's Technology except as otherwise provided hereunder.** Inco also agrees that during such Relevant Period it will not utilize any of Viridian's Technology or improvements thereto without the express written consent of Viridian except as otherwise provided for in this Agreement. . . . Nothing in this Agreement shall be deemed to grant Inco the right or license to use Viridian's Technology or improvements thereto after the termination of this Agreement or the end of the Relevant Period, as the case may be, absent a license agreement between Viridian and Inco except as otherwise provided for in this Agreement. **Inco and its Affiliates agree to refrain from ever using any of Viridian's Technology or improvements thereto absent a license agreement between Viridian and Inco except as otherwise provided for in this Agreement.**

(*Id.* ¶ 70; Agreement Art. XV(A) (emphasis added).) The PTA similarly barred Vale "from ever using any of Viridian's Confidential Information, technology or proprietary materials" absent a licensing agreement or written authorization from Viridian. (*Id.* ¶ 72; *see* Marino Cert. at Ex. A, PTA ¶ 4, App. B.)

Viridian asserts that Vale breached these non-use and non-competition provisions, specifically alleging that Vale personnel have used metal hyperaccumulator plants listed in Viridian's patents and "phytomining/phytoremediation/revegetation information" obtained from "scientific personnel covered by [the PTA's] non-use, non-competition and confidentiality provisions." (*Id.* ¶¶ 72, 74-76.) Vale also allegedly "used a trade industry group to do an end run around Viridian to obtain information" from Viridian-affiliated scientists. (*See id.* ¶¶ 77-81).

## III. Procedural History

On April 9, 2018, Viridian filed a one-count breach of contract complaint against Vale in Bergen County Superior Court. (D.E. 1, Ex. A.) Vale removed the case to this Court on October 16, 2018, relying on diversity jurisdiction. (D.E. 1 ¶¶ 2-6.) Two months later, Viridian filed the operative amended complaint and asserted claims for breach of contract (Count 1), fraud (Counts 2, 5, and 6), promissory estoppel (Count 3), intentional interference with prospective economic advantage (Count 4), conversion (Count 7), breach of the implied covenant of good faith and fair

dealing (Count 8), unjust enrichment (Count 9), and an accounting (Count 10).  (D.E. 11.)  On January 11, 2019, Vale moved to dismiss the amended complaint with prejudice.  (D.E. 20.)

While the parties were engaged in discovery, Viridian informed the Court that it had "recently learned that there is no diversity in this case and therefore no subject matter jurisdiction," and requested leave to file a motion to remand.  (D.E. 56.)  The Court granted that request and administratively terminated Vale's pending motion to dismiss.  (D.E. 57.)  After several months of jurisdictional discovery, Viridian moved to remand the case back to Bergen County.  (D.E. 70, 94.)  Vale opposed and also sought attorneys' fees and costs on grounds that the remand motion was filed in bad faith.  (D.E. 97.)

On April 27, 2022, Magistrate Judge Waldor issued a report and recommendation in which she recommended that the Court grant Viridian's remand motion and deny Vale's sanctions request.  (D.E. 113.)  Upon considering Vale's timely objections, the Court adopted Judge Waldor's report and recommendation in part but ultimately rejected her recommendation that the matter be remanded to Bergen County.  Accordingly, the Court issued an opinion and order on June 22, 2022 denying both Viridian's motion to remand and Vale's request for sanctions.[2]  (D.E. 122, 123.)

Vale has now renewed its motion to dismiss the amended complaint with prejudice.  (D.E. 127.)  In support, Vale relies on a moving and reply brief (D.E. 127-1, Mov. Br.; D.E. 137, Reply Br.), a certification of counsel (D.E. 127-2, Marino Cert.), and supporting exhibits.  Viridian has opposed, relying on its own brief.  (D.E. 133, Opp. Br.)

---

[2] Viridian moved for reconsideration of the Court's remand ruling, which was denied on March 30, 2023.  (D.E. 126, 140, 141.)

## IV.  Legal Standard

To survive a motion to dismiss under Rule 12(b)(6), the complaint "must contain sufficient factual matter, accepted as true to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A plausible claim is one that permits the court to "draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009) (quoting *Iqbal*, 556 U.S. at 678).  While "[t]he plausibility standard is not akin to a 'probability requirement,'" it demands "more than a sheer possibility that a defendant has acted unlawfully."  *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 556).  Fundamentally, the plausibility determination is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense."  *Fowler*, 578 F.3d at 211 (quoting *Iqbal*, 556 U.S. at 679).  In deciding a motion to dismiss, the court may consider documents attached to or incorporated in the complaint. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).

## V.  Analysis

### A.  Breach of Contract (Count 1)

Viridian's contract claim alleges two central breaches: (1) Vale's refusal to recognize and support Viridian's election to proceed with its own phytomining operations (the "phytomining rights breach"); and (ii) Vale's violation of the non-use, non-compete, and confidentiality provisions in the Agreement and the PTA[3] (the "confidentiality breach").  (*See* Am. Compl. ¶¶ 93-

---

[3] Vale argues as a preliminary matter that "the portion of" the breach of contract claim concerning the PTA should be dismissed because the PTA has a Texas forum-selection clause.  (Mov. Br. at 27; Reply Br. at 8-10.)  However, the Court sees no benefit in surgically removing the PTA allegations from the breach of contract claim at this juncture.

96.)  Vale argues that Viridian's breach of contract claim should be dismissed in its entirety but raises distinct arguments as to each alleged breach.

### 1.Timeliness – Both Breaches

Vale first argues that Viridian's contract claim should be dismissed on timeliness grounds as to both the phytomining rights breach and the confidentiality breach.  Under Texas law,[4] the statute of limitations for breach of contract is four years.  *See Smith Int'l, Inc. v. Egle Grp., LLC*, 490 F.3d 380, 386 (5th Cir. 2007).  Accrual of a breach of contract claim is governed by the "legal injury rule," which instructs that a cause of action accrues "when a wrongful act causes some legal injury, even if the fact of injury is not discovered until later, and even if all resulting damages have not yet occurred."  *Id.* at 387 (quoting *S.V. v. R.V.*, 933 S.W.2d 1, 4 (Tex. 1996)).  For purposes of a breach of contract claim, a "legal injury" occurs when the contract is breached—*i.e.*, when a party fails to perform a duty required by the contract.  *See id.*

As to the phytomining rights breach, Vale contends that the "legal injury" occurred when it failed to provide Viridian with the information it needed to independently exercise its phytomining rights during the Phase I Collaboration in violation of Article XIV of the Agreement. (Mov. Br. at 14-15.)  According to Vale, because the parties agreed to move forward with negotiation of a joint venture on October 12, 2007, and the Agreement granted Viridian the right to begin phytomining unilaterally 90 days after that date, the contract claim accrued no later than

---

[4] In its moving brief, Vale applies both New Jersey and Texas law to the breach of contract claim. (*See* Mov. Br. at 13-32.)  However, it relies solely on Texas law in reply (*see* Reply Br. at 2-12), which is consistent with Viridian's analysis (*see* Opp. Br. at 10-30) and the choice-of-law provisions in the Agreement and the PTA.  (*See* Agreement Art. XXI § A ("This Agreement shall be interpreted and applied in accordance with the laws of the State of Texas."); *see also* PTA ¶ 8 (Texas law shall apply to "[a]ny disputes or claims arising under this Agreement").)  Accordingly, for purposes of this motion, the Court will apply Texas law to the entirety of Viridian's breach of contract claim.

January 2008.  (*See id.*)  Viridian, on the other hand, contends that the first repudiation of any contractual term occurred on April 10, 2014, when Vale notified Viridian that it had no right to proceed with operations.  (Opp. Br. at 17.)  Although Viridian acknowledges Vale's failure to provide contractually required information *prior* to 2014, the amended complaint alleges that Vale "repeatedly assured" Viridian that the information would be provided either as part of the joint venture's preliminary activities, or when needed if the joint venture negotiations were unsuccessful.  (*See* Am. Compl. ¶ 68.)  As such, Viridian contends that "[n]either party viewed the delay as a breach until Viridian's phytomining rights were repudiated by Vale in 2014."  (Opp. Br. at 16.)

As to the confidentiality breach, Vale points to paragraph 77 of the amended complaint, which details Vale's alleged use of "a trade industry group to do an end run around Viridian to obtain information" from Viridian-affiliated scientists.  (Am. Compl. ¶ 77.)  That paragraph details a "multi-year 'Review Of In Situ Remediation and Phytoremediation Of Ni Contaminated Soils,'" which "was set to start on August 1, 2013 and continue until July 31, 2015."  (*Id.*)  According to Vale, Viridian's claim is untimely because the amended complaint alleges misuse of confidential information by August 2013, the project start date.  (Mov. Br. at 29.)  Viridian disputes that accrual date, arguing that Vale "cherry-picked" paragraph 77 of the amended complaint and ignored other examples of prohibited use that indisputably fall within the limitations period.  (Opp. Br. at 25.)  Even as to Vale's chosen example, Viridian contends that the July 2015 project end date—the date "the information was delivered"—is more appropriate for accrual purposes.  (*Id.*)

In short, Vale takes a strict approach to accrual, whereas Viridian focuses on the parties' course of conduct during their years-long joint venture negotiations.  The Court is satisfied that the facts alleged in the amended complaint are sufficient to withstand Vale's statute of limitations

13

challenge. Indeed, Viridian's position brings to the forefront an important issue that is "not generally amenable to resolution on a Rule 12(b)(6) motion"—whether Viridian is entitled to equitable tolling of the statute of limitations. *Abecassis v. Wyatt*, 785 F. Supp. 2d 614, 652 (S.D. Tex. 2011) (recognizing that applicability of equitable tolling "generally requires consideration of evidence beyond the pleadings") (internal citations and quotations omitted). A finding to the contrary would run afoul of the well-settled principle that a complaint should not be dismissed on statute of limitations grounds unless "its allegations affirmatively demonstrate that the plaintiff's claims are barred by the statute of limitations and fail to raise some basis for tolling." *Frame v. City of Arlington*, 657 F.3d 215, 240 (5th Cir. 2011). Whether Vale's interpretation rules the day awaits discovery; its limitations defense is not "clear on the face of the [amended] complaint." *See China Nat. Bldg. Material Inv. Co. v. BNK Int'l, LLC*, 2015 WL 363275, at *4-7 (W.D. Tex. Jan. 27, 2015) (denying motion to dismiss on basis of statute of limitations, reasoning that court could only resolve timeliness issue upon consideration of "a full evidentiary record"); *accord Frame*, 657 F.3d at 240 (recognizing that statute of limitations is an "issue that must be resolved through discovery and summary judgment or trial").[5]

### 2. Failure to Perform – Phytomining Rights Breach Only

Vale next argues that the phytomining rights allegations should be dismissed because Viridian failed to perform its own obligations under the Agreement, an essential element of a breach of contract claim under Texas law. *See Lewis v. Bank of Am. NA*, 343 F.3d 540, 544–45 (5th Cir. 2003) (breach of contract claim requires "1) the existence of a valid contract; 2)

---

[5] Vale rightly points out in reply that equitable tolling is to be applied sparingly, particularly in the context of a breach of contract claim. *See Beltway Park Baptist Church, Inc. v. Bolton*, 2020 WL 868069, at *3 (Tex. App. Feb. 21, 2020). But that does not change the Court's conclusion that Vale's statute of limitations argument is better served for a later stage of proceedings.

performance or tendered performance by the plaintiff; 3) breach of the contract by the defendant; and 4) damages to the plaintiff resulting from the breach").  Specifically, Vale faults Viridian for: (i) not promptly electing to phytomine "on its own" after such right arose, allegedly in January 2008; and (ii) failing to perform under the Agreement's "time is of the essence" and "best efforts" provisions.  (*See* Mov. Br. at 17.)

Vale's arguments are grounded in the Agreement's "election" clause, which provides in pertinent part as follows:

> If, within ninety (90) days after the parties' election to enter into a V-I Joint Venture, the parties have failed to sign a V-I JV Agreement, Viridian shall have the right to proceed on its own with respect to Viridian Operations under Article III Section A(2)[6] of this Agreement, provided, however, in the event Viridian so elects to proceed under Article III Section A(2), the parties shall continue to negotiate in good faith for up to an additional 180 days in an effort to reach agreement on the terms of the V-1 Joint Venture.

(Agreement Art. II § D.)  Vale concedes that the election clause on its face does not include an express timeframe for Viridian's election.  But it argues that because the election clause provides for negotiations to "continue" for up to an "additional" 180 days following an election, it is axiomatic that an election be close in time to the original 90-day negotiations window.  (*See* Mov.

---

[6] As explained *supra*, Article III, Section A(2) of the Agreement governs Viridian's unilateral election:

> It is understood and agreed by Viridian and Inco that, if the V-I Joint Venture does not proceed because Inco alone has elected not to enter into the V-I Joint Venture . . . , then Viridian shall designate, after discussing such acreage with Inco, what acreage within the Initial Target Sites Viridian believes would be most suitable for commercial Phytomining ("Initial Commercial Designated Acreage"). Within thirty (30) days after the designation by Viridian of the Initial Commercial Designated Acreage, two blocks, each of which is expected to be approximately 6,000 acres, within the Initial Target Sites ("Designated Blocks") shall be designated by Inco. Viridian shall have the right, subject to the terms and conditions of this Agreement, to conduct Viridian Operations within the Designated Blocks[.]

(Agreement Art. III §A(2).)

Br. at 17-18.)   To buttress that interpretation, Vale cross-references the Agreement's "time is of the essence" and "best efforts" provisions, both of which are found in Article XXII, Section G of the Agreement:

> <u>Time</u>.   **Time is of the essence** with respect to the Agreement.   Where time is not specified in the Agreement the parties shall **use their best efforts** to meet their respective duties, responsibilities and obligations as soon as reasonably practical, provided that, this provision shall in no way limit any party's duties, obligations and responsibilities under the Agreement.

(Agreement Art. XXII § G (emphasis added).)

Vale contends that Viridian's February 2014 election was untimely because it occurred over six years after the parties' October 2007 decision to enter a joint venture; as such, Vale had no obligation to honor the election.   However, the Court cannot make that inferential leap at the motion to dismiss stage.   The amended complaint alleges that Viridian's election was both timely under the Agreement and reasonable in light of the unique circumstances alleged, including the parties extensive joint venture negotiations from 2007 through 2011 and Vale's refusal to meaningfully engage with Viridian from July 31, 2012 through the date of its election.   (*See* Am. Compl. ¶¶ 61-64.)   Whether Viridian used its "best efforts" to elect "as soon as reasonably practical" is an issue that needs a fully developed factual record.   *See Wheeler v. Safeco Ins. Co. of Indiana*, 2022 WL 1295288, at *3 (W.D. Tex. Apr. 29, 2022) ("[I]nsofar as a dispute exists concerning the failure of a party to perform a contract, the court submits the disputed fact questions to the fact finder.") (internal citations and quotations omitted).

Vale also cites the Agreement's "time is of the essence" and "best efforts" provisions as independent examples of Viridian's nonperformance.   Vale argues that such provisions are "important as a matter of public policy" where, as here, contracts involve mineral and mining rights, and points to cases where Texas courts enforced express or implied "time is of the essence"

and "best efforts" provisions in similar contracts.  (*See* Mov. Br. 20-26.)  But here again, whether Viridian adequately performed under those provisions is an issue inappropriate for resolution at the motion to dismiss stage.  *See DaimlerChrysler Motors Co., LLC v. Manuel*, 362 S.W.3d 160, 174 (Tex. App. 2012) ("Whether a contractual best efforts obligation has been met or fulfilled is usually a question of fact because it is heavily dependent upon the particular circumstances of the case."); *see also Indel Food Prod., Inc. v. Dodson Int'l Parts, Inc.*, 561 F. Supp. 3d 722, 730-31 (W.D. Tex. 2021) (recognizing fact-intensive inquiry involved for analyzing performance under "time is of the essence" clauses, including whether parties acted in a manner necessitating waiver). For now, the phytomining rights allegations are sufficient to withstand Vale's Rule 12(b)(6) challenge.

### 3. Failure to State a Claim – Confidentiality Breach Only

Finally, Vale seeks dismissal of Viridian's confidentiality breach allegations for failure to state a claim under Rule 12(b)(6).  Vale challenges the allegations as conclusory and contends that the amended complaint fails to specify what "confidential information" Viridian possessed or when it was misused.  (*See* Mov. Br. at 29-30.)  However, a claim for breach of contract is not subject to heightened pleading requirements.  *See Whiddon v. Chase Home Fin., LLC*, 666 F. Supp. 2d 681, 692 (E.D. Tex. 2009) (recognizing that "the heightened pleading requirements of Rule 9(b)" are inapplicable to breach of contract claim).  Moreover, the amended complaint alleges that: (i) during the feasibility studies, Viridian "broadly disclosed its phytomining, phytoremediation and revegetation technology, information and data to Vale in reliance on Vale's contractual commitment not to use or disclose this technology, information and data" absent a licensing agreement or other authorization from Viridian (Am. Compl. ¶ 72); and (ii) although Vale never received such an authorization from Viridian, "Vale personnel . . . have been using metal

hyperaccumulators listed in Viridian's patents such as 'Geissois pruinose,'" as well as "phytomining/phytoremediation/revegetation information obtained from scientists" subject to the Agreement and PTA (*id.* ¶¶ 73-76).  The amended complaint further alleges that Vale attempted to circumvent Viridian by using a trade industry group, which retained Viridian-affiliated scientists to undertake a phytoremediation project from August 2013 through July 2015.  (*See id.* ¶ 77.)

A reasonable inference arises from these pleaded facts to permit Viridian's confidentiality breach claim to go forward.  Vale's motion to dismiss Count 1 is therefore denied.[7]

### B.  Fraud Claims (Counts 2, 5, and 6)

Viridian asserts three fraud claims: common law equitable fraud (Count 2), fraud in the inducement (Count 5), and fraud (Count 6).  Viridian's claims focus both on Vale's alleged false representations at the time the parties executed the Agreement and the PTA (fraud in the inducement), as well as those made throughout the parties' 2007-2012 negotiations (fraud in the performance).  For example, the amended complaint alleges that Vale had no intention of complying with its obligations at the time the parties executed the Agreement and the PTA; specifically, its obligation to protect Viridian's confidential information and technology.  (Am. Compl. ¶¶ 108, 146, 148, 165.)   The amended complaint further alleges that after the parties executed the Agreement, Vale repeatedly assured Viridian that it intended to reach a mutually agreeable joint venture or equity purchase agreement, and further that it would provide Viridian with the information it needed to pursue unilateral phytomining operations if those negotiations proved futile.  (*Id.* ¶¶ 111, 167.)  However, Vale allegedly had "no intention of ever entering into

---

[7] In light of the Court's conclusion that Viridian has sufficiently alleged its two central breaches, the Court need not address Vale's alternative argument that Viridian's "laundry list of other purported breaches . . . cannot salvage Viridian's breach of contract claim."  (Mov. Br. at 26-27.)

those agreements" or providing Viridian with information for its own phytomining operation. Instead, Vale wanted to "run out the clock on Viridian's intellectual property portfolio" and to use that portfolio for its own benefit.  (*Id.* ¶ 111.)

Vale challenges Viridian's fraud claims under the economic loss doctrine, which provides that "where the damages claimed are . . . economic loss to the subject of the contract itself, the remedy ordinarily is one of contract alone." *Kevin M. Ehringer Enterprises, Inc. v. McData Servs. Corp.*, 646 F.3d 321, 325 (5th Cir. 2011); *see also Sourcing Mgmt., Inc. v. Simclair, Inc.*, 2012 WL 12884918, at *2 (N.D. Tex. Feb. 27, 2012) ("There is no tort liability for failing to do what one has promised to do in the absence of a duty to act apart from the promise made.").[8]  Vale urges the Court to dismiss all three of Viridian's fraud claims on grounds that "they arise entirely from Vale's alleged non-performance of the parties' contracts, and not from any misrepresentations 'extrinsic' to the contract itself.'"  (Moving Br. at 34.)   Vale points out, correctly, that each alleged fraudulent representation is tied to an express provision of the Agreement and/or the PTA.  (*See, e.g.*, Agreement Art. II § D (parties to "negotiate in good faith a comprehensive Phytomining joint venture agreement"), Art. XIII (imposing duty on parties to protect confidential information), XIV (Vale to provide "any and all information reasonably required by Viridian to evaluate potential Phytomining opportunities"), XV (imposing non-compete obligations); *see also* PTA § 4, App. B (confidentiality and non-disclosure agreement governing provision of confidential information and technology).)

---

[8] The parties apply both Texas and New Jersey law to the remaining causes of action, and they represent that no conflict exists.  (Mov. Br. at 33-40; Opp. Br. at 30-43.)  Accordingly, consistent with its analysis as to Count 1, the Court will apply Texas law to Counts 2 through 10.  *See* n. 4, *supra*.

The economic loss doctrine generally precludes a tort cause of action if "(1) the claim is for breach of duty created *solely* by contract rather than a duty imposed by law, and (2) the injury is only the economic loss to the subject of the contract itself." *Eastman Chem. Co. v. Niro, Inc.*, 80 F. Supp. 2d 712, 717 (S.D. Tex. 2000). Courts in Texas have applied this general analysis to claims grounded in fraud in the performance of a contract, such as Viridian's claims for fraud and equitable fraud. *See, e.g., id.* at 717-18; *Peterson Grp., Inc. v. PLTQ Lotus Grp., L.P.*, 417 S.W.3d 46, 63 (Tex. App. 2013) (analyzing duty imposed and source of loss). Here, Viridian's losses flow directly from the Agreement and the PTA. Accordingly, its fraud and equitable fraud claims cannot proceed alongside its claim for breach of contract. *See Firequip, Inc. v. Precision Frac, LLC*, 2018 WL 6186000, at *3 (W.D. Tex. Jan. 10, 2018) (dismissing fraud claim that "amount[ed] to nothing more" than a claim for breach of contract); *accord Kevin M. Ehringer Enterprises, Inc.*, 646 F.3d at 325 (recognizing that "mere failure to perform contractual obligations as promised does not constitute fraud but is instead a breach of contract"). As such, Counts 2 and 6 are dismissed with prejudice.[9]

But Viridian's claim for fraudulent inducement in Count 5 requires a different analysis. The Texas Supreme Court has determined that a claim for fraudulent inducement is not barred merely because the damages could be characterized as "economic loss related to the subject matter of the contract," for "it is well established that the legal duty not to fraudulently procure a contract is separate and independent from the duties established by the contract itself." *Formosa Plastics Corp. USA v. Presidio Engineers & Contractors, Inc.*, 960 S.W.2d 41, 46-47 (Tex. 1998)*; see In re Kaplan Higher Educ. Corp.*, 235 S.W.3d 206, 209 (Tex. 2007) ("Claims of fraudulent

---

[9] Counts 2 and 6 also include allegations sounding in fraudulent inducement. (*See, e.g.,* Am. Compl. ¶¶ 103-10, 164-66.) However, those allegations are pled in Count 5 which, as explained *infra*, survives the instant motion to dismiss.

inducement arise from general obligations imposed by law, not the underlying contract."). Therefore, if the Court determines that the plaintiff "presents legally sufficient evidence on each of the elements of a fraudulent inducement claim, any damages suffered as a result of the fraud sound in tort," and the claim can proceed concurrently with a claim for breach of contract. *Formosa Plastics*, 960 S.W.2d at 47.

Under Texas law, a plaintiff claiming fraud must demonstrate that: "(1) the defendant made a material misrepresentation; (2) the defendant knew at the time that the representation was false or lacked knowledge of its truth; (3) the defendant intended that the plaintiff should rely or act on the misrepresentation; (4) the plaintiff relied on the misrepresentation; and (5) the plaintiff's reliance on the misrepresentation caused injury." *Int'l Bus. Machines Corp. v. Lufkin Indus., LLC*, 573 S.W.3d 224, 228 (Tex. 2019). In the case of a fraudulent inducement, "the 'misrepresentation' occurs when the defendant falsely promises to perform a future act while having no present intent to perform it," and "[t]he plaintiff's 'reliance' on the false promise 'induces' the plaintiff to agree to a contract the plaintiff would not have agreed to if the defendant had not made the false promise." *See id.*

The amended complaint alleges that Vale never intended to comply with its obligations under the Agreement and the PTA, including its obligation to protect Viridian's confidential information and technology. (Am. Compl. ¶¶ 141-42.) Instead, Vale wanted to gain access to and use Viridian's technology for its own benefit. (*Id.* ¶¶ 144-45, 148.) Accordingly, Vale falsely represented that it only intended to use Viridian's technology for the purpose of exploring mutually agreeable business opportunities, which led to Viridian's accepting the terms of the Agreement and the PTA. (*Id.* ¶¶ 148-49, 161.) Further, the amended complaint alleges specific misconduct by Vale employees. (*See id.* ¶¶ 74-75 (named Vale employee used "metal hyperaccumulators

listed in Viridian's patents" at Vale's sites); *see also id.* ¶ 77 (Vale used trade industry group to obtain information from Viridian-affiliated scientists "covered by the non-use and non-competition provisions of" the Agreement and the PTA).)  Moreover, the amended complaint alleges that Viridian would not have agreed to share its confidential information and technology had it known of Vale's true intentions, and that it suffered damages as a result.  (*Id.* ¶¶ 149, 160.)

The Court finds these allegations sufficient to warrant discovery.  Vale's motion to dismiss Count 5 is therefore denied insofar as the amended complaint sufficiently pleads facts supporting a claim for fraud in the inducement (not in the performance) of the Agreement and the PTA.

### C.  Quasi-Contract Claims (Counts 3 and 9)

Viridian asserts quasi-contract claims for promissory estoppel (Count 3) and unjust enrichment (Count 9).  Vale argues that both should be dismissed because valid contracts govern the subject matter of the parties' dispute.  (Moving Br. at 34-35.)

As a general matter, "when a valid, express contract covers the subject matter of the parties' dispute, there can be no recovery under a quasi-contract theory."  *N. Cypress Med. Ctr. Operating Co. v. Cigna Healthcare*, 781 F.3d 182, 204 (5th Cir. 2015) (quoting *City of the Colony v. North Tex. Mun. Water Dist.*, 272 S.W.3d 699, 731 (Tex. App. 2008)).  Although Viridian recognizes this general principle, it argues that it may plead both contract and quasi-contract claims in the alternative.  (*See* Opp. Br. at 36-37.)  However, "alternative pleading of equitable claims is unavailable unless one party disputes the existence of a contract governing the dispute."  *Human Power of N, Co. v. Synergixx, LLC*, 2018 WL 3420820, at *2-3 (W.D. Tex. July 12, 2018), *adopted by*, 2018 WL 4343433 (W.D. Tex. Aug. 2, 2018) (citing *Johnson v. Wells Fargo Bank*, *NA*, 999 F. Supp. 2d 919 (N.D. Tex. 2014)); *see Commonwealth Cap. Corp. v. Medshare Techs., Inc.,* 2015 WL 10818622, at *2 (N.D. Tex. Oct. 1, 2015) (allowing for alternative pleading of contract and

quasi-contract claims where defendant "attacked the validity of the contract"). Here, Vale does not argue that the Agreement and the PTA are invalid or unenforceable; to the contrary, Vale concedes to "the existence of a valid contract" between the parties. (Reply Br. at 13.) As such, Viridian's alternative pleading argument is misguided.

Viridian urges the Court to uphold its quasi-contract claims on grounds that both are premised on tortious acts independent of the parties' contracts. (Opp. Br. at 37.) Although Viridian is correct that quasi-contract claims may proceed alongside a claim for breach of contract where the complaint alleges "additional promises covering subject matter not covered by the express contract," that is not the case here. *Hum. Power of N*, 2018 WL 3420820, at *3. The promises alleged in support of Viridian's promissory estoppel cause of action—specifically, that Vale would: (i) grant Viridian phytomining rights and share information Viridian reasonably required to conduct phytomining operations; (ii) refrain from utilizing Viridian's technology and other confidential information absent authorization; and (iii) enter into good faith joint venture negotiations (*see* Am. Compl. ¶¶ 125, 127-28)—are attached to express provisions of the Agreement and the PTA. (*See, e.g.*, Agreement Arts. II (collaboration), III (unilateral election), XIII (confidential information), XIV (provision of information).) So, too, are the benefits alleged in support of Viridian's unjust enrichment claim. (*See* Am. Compl. ¶ 183 (benefits retained by Vale include the "usage of Viridian's . . . technology that Vale obtained but failed to license" as well as the "considerable benefits Vale reaped by Viridian's conduct of phytomining . . . at Vale's mining and smelting sites and Vale's utilization and trumpeting of those activities").)

In short, because valid contracts govern the subject matter of Viridian's quasi-contract claims, Counts 3 and 9 are dismissed with prejudice.

### D. Intentional Tort Claims (Counts 4 and 7)

Viridian asserts two intentional tort claims: intentional interference with prospective economic advantage (Count 4) and conversion (Count 7).

#### 1.Intentional Interference (Count 4)

As a preliminary matter, Viridian's claim for interference with prospective economic advantage does not appear to exist under Texas law. *See Small Bus. Assistance Corp. v. Clear Channel Broad., Inc.*, 210 F.3d 278, 280 n. 1 (5th Cir. 2000). Rather, Texas recognizes two tortious interference claims: tortious interference with contract and tortious interference with business relations. *See El Paso Healthcare Sys., Ltd. v. Murphy*, 518 S.W.3d 412, 421 (Tex. 2017).

Viridian's argument that it nonetheless has pled a viable tortious interference with contract claim is misguided. The amended complaint alleges that Vale breached the Agreement and the PTA; it does not allege, as required by Texas law, that Vale interfered with a third-party contract. *See ProTradeNet, LLC v. Predictive Profiles, Inc.*, 369 F. Supp. 3d 788, 791 (W.D. Tex. 2019) (recognizing that a defendant "must be a stranger to a contract to tortiously interfere with it") (internal citations and quotations omitted). Despite the dearth of allegations in the amended complaint grounded in contractual interference, Viridian argues in its opposition brief that Vale "can be found liable for interfering with the contracts of its affiliated entities . . . or conspiring with such affiliates," and relies on a 1999 case from the Northern District of Texas. (*See* Opp. Br. at 39-40; *see also id.* at 39, n. 17 (quoting *Affiliated Comput. Servs. v. Caremark, Inc.*, 49 F. Supp. 2d 882, 884 (N.D. Tex. 1999).) However, that argument is unsupported by recent Texas case law. *See ProTradeNet, LLC*, 369 F. Supp. 3d at 793 (citing state and federal precedent for proposition that "a corporate parent is incapable of tortious interfering with the contracts of its subsidiary"); *see also Adidas Am. Inc. v. Shoebacca Ltd.*, 2021 WL 4399745, at *2 (N.D. Tex. Sept. 27, 2021)

(recognizing that "[m]ost Texas courts addressing the issue have held it is impossible for a parent corporation to interfere with the contract of its wholly owned subsidiary").

As such, Viridian's claim is more akin to an interference with prospective business relations cause of action, which requires the plaintiff to demonstrate: "(1) a reasonable probability that the plaintiff would have entered into a business relationship; (2) an independently tortious or unlawful act by defendant that prevented the relationship from occurring; (3) the defendant did such act with a conscious desire to prevent the relationship from occurring or the defendant knew the interference was certain or substantially certain to occur as a result of the conduct; and (4) the plaintiff suffered actual harm or damages as a result of the defendant's interference." *Mission Trading Co., Inc. v. Lewis*, 2017 WL 6935824, at *7 (S.D. Tex. July 31, 2017), *report and recommendation adopted,* 2017 WL 4941408 (S.D. Tex. Nov. 1, 2017) (internal citations and quotations omitted).  Here, too, Viridian's allegations fall short.  Viridian alleges that Vale interfered with Viridian's "expectancy" of "economic benefit and advantage" by "depriv[ing] Viridian of its ability to profit from its technology and to establish successful phytomining operations."  (Am. Compl. ¶¶ 136-38.)  At best, these allegations demonstrate Vale's interference with Viridian's own business—not with any "specific third-party relationship."  *Super-Sparkly Safety Stuff, LLC v. Skyline USA, Inc.*, 2019 WL 4860959, at *2 (N.D. Tex. Oct. 2, 2019) (granting motion to dismiss tortious interference with business relations claim).  Although Viridian vaguely alleges that Vale's actions "cannibalized potential business opportunities and took [away] from Viridian's reasonable expectation of revenues, profits, sales and licensing fees" (*see* Am. Compl. ¶ 138), it fails to allege what those purported "business opportunities" were, let alone that Vale's actions prevented Viridian from pursuing them.  Nor has it alleged that Vale acted with the specific intent of preventing those inchoate opportunities from coming to fruition.

25

In short, Viridian has failed to allege the essential elements of a tortious interference claim under Texas law.  Count 4 is therefore dismissed with prejudice.

### 2. Conversion (Count 7)

Turning to the conversion claim, Vale seeks dismissal under the economic loss doctrine which, as explained in the Court's fraud analysis, *supra*, "generally bars a tort claim when no factual basis for the tort claim would exist had the defendant complied with the contract." *Lincoln Gen. Ins. Co. v. U.S. Auto Ins. Servs., Inc.,* 787 F.3d 716, 726 (5th Cir. 2015).  As was the case with Viridian's claims for fraud and equitable fraud, conversion is not a *per se* exception to the economic loss doctrine.  *See Castle Texas Prod. Ltd. P'ship v. Long Trusts*, 134 S.W.3d 267, 275 n. 3 (Tex. App. 2003) (recognizing that *Formosa*'s exception to economic loss doctrine is limited to claims for fraudulent inducement).  Accordingly, the Court must carefully analyze the facts underlying Viridian's conversion claim to ascertain whether they "give rise to liability independent of the fact that a contract exists between the parties." *Aries Bldg. Sys., LLC v. Vanguard Univ. of S. California*, 2020 WL 9815996, at *2 (S.D. Tex. Aug. 28, 2020) (internal citations and quotations omitted); *see Dixie Carpet Installations, Inc. v. Residences at Riverdale, LP*, 599 S.W.3d 618, 636 (Tex. App. 2020) (where plaintiff's claim sounded in contract, plaintiff could not "recover damages for conversion arising from the contract's breach"); *but see Cass v. Stephens*, 156 S.W.3d 38, 69 (Tex. App. 2004) (economic loss doctrine did not bar conversion claim where defendants "breach[ed] an obligation which exists outside the contract, and had nothing to do with [it]").

Here, the amended complaint alleges that Vale converted Viridian's "phytomining rights, mining reserves and deposits," as well as its "technology [] and data, information, and materials." (Am. Compl. ¶ 171.)  As such, Viridian's conversion allegations are inextricably tied to its breach of contract claim, which is premised on Vale's failure to comply with the non-use, non-compete,

confidentiality provisions of the Agreement and the PTA, as well as Vale's refusal to acknowledge Viridian's unilateral phytomining rights under the Agreement.  (*Id.* ¶¶ 93-96; *see* Agreement Arts. XIII (confidentiality), XIV (disclosure of information), XV (non-compete); *see also* PTA ¶ 4, App. B (confidentiality and non-disclosure).)  Accordingly, the economic loss doctrine bars Viridian's conversion claim, and Count 7 is dismissed with prejudice.[10]

### E.  Implied Covenant of Good Faith and Fair Dealing (Count 8)

Viridian asserts a claim for breach of the implied covenant of good faith and fair dealing (Count 8), which Vale has moved to dismiss as duplicative of Viridian's breach of contract claim. That argument is well-taken, as the amended complaint explicitly references "Vale's failure to perform its obligations under the Agreement and its breach of the Agreement's restrictions" as independent "breaches" of the implied covenant of good faith and fair dealing.   (Am. Compl. ¶ 176.)   Moreover, although Viridian argues that its good faith allegations reference conduct extraneous to the Agreement—*i.e.*, that "Vale negotiated in bad faith and engaged in competitive behavior using information it improperly obtained" (*see* Opp. Br. at 37)—that argument is belied by the Agreement itself, which expressly references the parties' obligations to "negotiate in good faith" (Agreement Art. II § D), to use confidential information "solely for purposes of this Agreement" (*id.* Art. XIII § A), and to not engage in competitive activity (*id.* Art. XV § A).  For that reason alone, Count 8 is subject to dismissal.

Even if Viridian's good faith claim were not duplicative of its breach of contract claim, the Court would nonetheless dismiss it for failure to plead the existence of a "special relationship" between the parties.  *See Electro Assocs., Inc. v. Harrop Const. Co.*, 908 S.W.2d 21, 22 (Tex. App.

---

[10]  In light of the foregoing, the Court need not reach Vale's alternative argument that the conversion claim should be dismissed for failure to allege the conversion of "tangible property." (*See* Mov. Br. at 38.)

1995), *writ denied* (Feb. 1, 1996) ("The Texas Supreme Court has recognized a common-law duty of good faith and fair dealing only where a 'special relationship' exists between the parties to a contract.").  Viridian contends that it has satisfied the "special relationship" requirement by alleging that the parties were engaged in a joint venture, relying on a 1951 Texas Supreme Court case which recognized that "[p]ersons engaged in a joint adventure . . . owe to each other the utmost good faith."  (Opp. Br. at 38 n.15 (quoting *Fitz-Gerald v. Hull*, 150 Tex. 39, 54 (1951)).)  However, the Fifth Circuit has expressly rejected Viridian's argument.  *See Hux v. S. Methodist Univ.*, 819 F.3d 776, 782 n. 16 (5th Cir. 2016) (citing *Fitz-Gerald* for proposition that joint venturers are "just ordinary formal fiduciaries," and concluding that "[i]t is not accurate to say" that the joint venture relationship "give[s] rise to a quasi-fiduciary duty of good faith and fair dealing enforceable in tort").  Viridian's failure to allege the requisite "special relationship" constitutes a separate basis for granting Vale's motion.  Count 8 is dismissed with prejudice.

### F.  Accounting (Count 10)

Finally, Viridian asserts a standalone cause of action for an accounting (Count 10).  "An action for accounting may be a suit in equity, or it may be a particular remedy sought in conjunction with another cause of action." *Watson v. Citimortgage, Inc.*, 814 F.  Supp. 2d 726, 737 (E.D. Tex. 2011) (quoting *Brown v. Cooley Enters., Inc.*, 2011 WL 2200605, at *1 (N.D. Tex. June 7, 2011)).  When pursued as a separate, equitable cause of action, a request for an accounting "is proper when the facts and accounts presented are so complex [that] adequate relief may not be obtained at law." *Steele v. Green Tree Servicing, LLC*, 2010 WL 3565415, at *8 (N.D. Tex. Sept. 7, 2010), *aff'd*, 453 Fed. Appx. 473 (5th Cir. 2011) (quoting *T.F.W. Mgmt., Inc. v. Westwood Shores Prop. Owners Ass'n*, 79 S.W.3d 712, 717 (Tex. App. 2002)).  However, "if the party can obtain similar relief through standard discovery, the trial court may decline to order an accounting." *Id.*

Here, Viridian generally alleges that it is entitled to an accounting as an equitable cause of action because the matters at issue are "complicated," as are the "accounts and sales involved." (Am. Compl. ¶ 185.)  However, Viridian has not supported that unadorned assertion with sufficient facts.  *See Donnelly v. JP Morgan Chase, NA*, 2014 WL 429246, at *4 (S.D. Tex. Feb. 4, 2014) (rejecting plaintiff's "bare assertion that she is entitled to an accounting" as "inadequate as a matter of law"); *Folmar v. Bank of Am., N.A.*, 2014 WL 12591912, at *3 (N.D. Tex. Feb. 11, 2014) ("bare assertion" that plaintiff was entitled to an accounting failed to state a claim under Rule 12(b)(6)). Moreover, although Viridian alleges that it is "unaware of the full extent" of Vale's unauthorized acts (Am. Compl. ¶ 185), nothing in the amended complaint suggests that the information Viridian seeks cannot be "obtained through discovery or as a remedy for [its] other causes of action." *Burbank v. Compass Bank*, 2016 WL 3618691, at *8 (E.D. Tex. Mar. 29, 2016); *see Quintel Tech. Ltd. v. Huawei Techs. USA, Inc.*, 2016 WL 5423178, at *17 (E.D. Tex. Sept. 27, 2016) (dismissing cause of action for an accounting where amended complaint failed to allege that "the accounts and facts in this case are so complex that adequate relief cannot be obtained through the separate causes of action" alleged).  Indeed, Viridian seeks an accounting as a remedy for its breach of contract cause of action which, as explained *supra*, is sufficiently alleged to withstand Vale's Rule 12(b)(6) challenge.  (*See* Am. Compl. ¶ 101.)

As such, Count 10 is dismissed with prejudice.

## VI.    Conclusion

For the reasons set forth above, Vale's motion to dismiss is granted as to Counts 2, 3, 4, 6, 7, 8, 9, and 10 and denied as to Counts 1 and 5.  An appropriate order will issue.

/s/ Katharine S. Hayden
Katharine S. Hayden, U.S.D.J

Date: June 7, 2023